❏ Original ❏ 

CLERK'S OFFICE
A TRUE COPY
Jul 06, 2021
s/ Jeremy Heacox
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| A Facebook Account Associated with Trehvis Foster; user ID 1682984231, that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California. | ) ) ) ) |

Case No. **21-M-435 (SCD)**

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before      7/20/21      *(not to exceed 14 days)*

❏ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to      Hon. Stephen C. Dries      .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❏ for _____ days *(not to exceed 30)*   ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued:      7-6-21. 3:00 pm

*Judge's signature*

City and state:      Milwaukee, WI            Hon. Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**
**Premises to be Searched**

This warrant to applies to information associated the Facebook user ID 1682984231 that is stored at premises owned, maintained, controlled, or operated by Facebook, a company headquartered in Menlo Park, California:

## ATTACHMENT B
## Items to be Seized

### I.      Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A for the period of November 1, 2016 to November 1, 2017:

1.      All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

2.      All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

3.      All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

4.      All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

5.      All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

6.      All other records and contents of communications and messages made or received by the user, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

7.      All "check ins" and other location information;

8.      All IP logs, including all records of the IP addresses that logged into the account;

9.      All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked;"

10.     All information about the Facebook pages that the account is or was a "fan" of;

11.     All past and present lists of friends created by the account;

12.     All records of Facebook searches performed by the account;

13.     All information about the user's access and use of Facebook Marketplace;

14.     The types of service utilized by the user;

15.     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

16.     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

17.     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within 14 DAYS of service of this warrant.

### B.      Information to be seized by the government

All information described above in Section A that constitutes fruits, evidence, and instrumentalities of violations of Title 18, United States Code, Sections 1591(a)(1) involving Trehvis Foster, including, for the account identifiers listed on Attachment A, information pertaining to the following matters:

1.      Messages, photographs, videos, memes, status updates, comments, or other postings or communications;

2.      Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

3.      Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

4.      The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

# UNITED STATES DISTRICT COURT

### for the

### Eastern District of Wisconsin

CLERK'S OFFICE
A TRUE COPY
Jul 06, 2021
s/ Jeremy Heacox

Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
)  Case No. **21-M-435 (SCD)**
A Facebook Account Associated with )
Trehvis Foster; user ID 1682984231, that is stored at premises owned, )
maintained, controlled, or operated by Facebook Inc., a company )
headquartered in Menlo Park, California. )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, U.S.C., Section 1591 (a)(1) | Sex Trafficking of a Child |

The application is based on these facts:

See the attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Melissa A. Fus, DOJ-DCI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means)*.

Date: **7/6/21**

_____
*Judge's signature*

City and state:  Milwaukee, WI

Hon. Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

I, Melissa A. Fus, being first duly sworn, hereby depose and state as follows:

## I. INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Wisconsin Department of Justice-Division of Criminal Investigation (DOJ-DCI) and have been in law enforcement since 2003.

2. I am currently assigned to the Human Trafficking Bureau for the Wisconsin Department of Justice and also the Federal Bureau of Investigation Wisconsin Human Trafficking Task Force ("WHTTF"). My duties as a Special Agent with the WI DOJ-DCI include human trafficking investigations involving minors and adults. I have gained experience in the conduct of such investigations through previous case investigations, formal training, and in consultation with law enforcement partners in local, state, and federal law enforcement agencies.

3. The lead investigator for this investigation is Special Agent Lindsay Conrad. Agent Conrad is a Special Agent with the Wisconsin Department of Justice-Division of Criminal Investigation (DOJ-DCI) and has been in law enforcement since 2007. Agent Conrad is currently assigned to the Human Trafficking Bureau for the Wisconsin Department of Justice. Agent Conrad's duties as a Special Agent with the WI DOJ-DCI include human trafficking investigations involving minors and adults. Agent Conrad has gained experience in the conduct of such investigations through previous case investigations, formal training, and in consultation with law enforcement partners in local, state, and federal law enforcement agencies. I have discussed this case with Agent Conrad.

4. The facts contained in this affidavit are known to me through my personal knowledge, training, and experience, and through information provided to me by SA Lindsay Conrad and other law enforcement officers, who have provided information to me during the

course of their official duties and whom I consider to be truthful and reliable. Some of the information was provided in response to administrative subpoenas and search warrants, and I believe that this information is also reliable.

## II.    PURPOSE OF AFFIDAVIT

5.      I make this affidavit in support of an application for a search warrant for information associated with a Facebook user ID account that is stored at premises owned, maintained, controlled, or operated by Facebook, Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscribers or customers associated with the specified Facebook user ID.

6.      More specifically, I seek to obtain and search records from Facebook, Inc. related to accounts held and used by Trehvis Foster and associated with Facebook user ID 1682984231.

7.      Based on my training and experience and the facts as set forth in this affidavit, I submit there is probable cause to believe that Trehvis Foster has committed violations of Title 18, United States Code, Sections 1591(a)(1) (sex trafficking of a child). There is also probable cause to believe that the information described in Attachment B will constitute evidence, instrumentalities, or fruits of these crimes.

## III.    PROBABLE CAUSE

### A. Information from JV-1

8.      On June 7, 2017 the parents of a minor female hereinafter referred to as JV-1 reported JV-1 missing to the Menasha Police Department. JV-1's mother reported that JV-1 had

not been seen since a family gathering on June 2, 2017. JV-1 had told a friend that she was going to Milwaukee for two weeks but would be back. JV-1's mother also stated there had been concern the previous year that JV-1 had been involved in sex trafficking activity. JV-1 was recovered by the Milwaukee Police Department on June 15, 2017.

9.      On July 27, 2017 the parents of JV-1 reported that JV-1 left their residence and attempted to get into a white Lexus with Wisconsin license plate 700-VBT. The driver of the Lexus was a black male, approximately 50 years old. JV-1's father spoke to the driver. The driver indicated he was there to pick up JV-1. When it was stated police were contacted and the male drove away. The vehicle was listed to a female individual in Milwaukee, Wisconsin, who was later determined to be Trehvis Foster's mother.

10.      In September 2017, SA Jed Roffers and SA Chad Racine received a request for assistance from Menasha PD regarding JV-1. JV-1 was interviewed and identified Cintaurean Mathies as the subject in Milwaukee who had her conduct sex acts in exchange for money. JV-1 also stated she resided with Mathies' "uncle," later identified as Trehvis Foster, during this period of time in Milwaukee.

11.      On March 3, 2020, SA Lindsay Conrad and SA Melissa Fus conducted an interview with JV-1 at her parents' residence. JV-1 disclosed that she had met Cintaurean J. Mathies, through social media in early 2017. JV-1 initially knew Mathies as "Tori." She stated that they chatted through Facebook Messenger and Instagram. At the time JV-1, was living with her parents in Menasha and she knew Mathies to live in Milwaukee.

12.      JV-1 stated Mathies told her that he was a tattoo artist. He had talked with JV-1 about her coming to Milwaukee to get a tattoo. JV-1 stated that Mathies knew she was 16 years old because they talked about her age on Facebook Messenger and Instagram.

13.    In June 2017, JV-1 travelled by Greyhound bus to Milwaukee.  She initially went to a friend's residence for one night, then Mathies and his "uncle," Trehvis Foster, picked up JV-1 in a white four door car driven by Foster.

14.    JV-1, Mathies, and Foster went to Foster's house, which JV-1 described as being near Congress Street and an old YMCA.  Law enforcement identified an address for Foster at 4253 N. 47th Street in Milwaukee, Wisconsin.  This address is a few blocks south of West Congress Street a few blocks southwest of a YMCA location.

15.    JV-1 stated that while she stayed with Mathies at Foster's residence she met Foster's wife, later identified as Cynthia Foster (Cynthia), and another female whom JV-1 knew as Mia. Mathies told Foster and Cynthia that JV-1 was 17 years old, turning 18 years old "soon."

16.    JV-1 stated the first night at Foster's residence, Mathies gave her a tattoo.  The next day, Mathies started talking about "starting a business" and asked her if she was ready to make money.  JV-1 understood Mathies to be talking about "trafficking," which JV-1 defined as "making money by having sex."

17.    Mathies only talked to JV-1 about "the business" in person because "people can look up old messages on Facebook and Instagram."  Mathies told JV-1 "head was $60, and sex was like $90 or $150."

18.    JV-1 stated Mathies had her walk the street.  Cars would pull up to her, and she would get in and give prices for what the person wanted.  When she was done, she would get the money and leave.

19.    JV-1 had to give all the money she earned through commercial sex dates to Mathies. Mathies never gave any money back to JV-1.  Mathies told JV-1 that once the money was "built up," he would give her a portion of the money.

20.     JV-1 stated the first time Mathies sent her out to walk the street and conduct sex dates for money was the second night she stayed with Mathies at Foster's residence.  JV-1 stated Foster drove the white car, while Mathies was in the front passenger seat and JV-1 and Mia were in the back seat.  JV-1 was unsure of the location where Mathies took her and Mia to walk to conduct dates.

21.     JV-1 was asked if Mathies had given her rules for when she conducted dates. JV-1 stated she was told to clear prices with Mathies. She was to collect the money first and if the subject did not give her the money, she was to contact Mathies and "he would come handle it." JV-1 could not give the specifics of what that meant. She also stated she had to leave her personal phone with Mathies, and he gave her a black flip phone to use when she would conduct dates.

22.     JV-1 conducted two dates the first night.  She stated the first was a "car date."  That date gave her $90, but she did not have any sexual contact with that person.  JV-1 stated that person "counselled" her, then gave her money so "she wouldn't get in trouble" with Mathies.  The second "car date" gave her $30 dollars for oral sex, which JV-1 performed on the buyer in his car.  JV-1 stated that when she walked back to where Mathies and Foster were waiting in Foster's car, she must have dropped the money, because she could not find it when she arrived.  When JV-1 told Mathies she had lost the money, he got angry and threw his phone at her, hitting her in the face. JV-1 stated it hurt, and she began to cry.

23.     When JV-1 and Mathies returned to Foster's home, Mathies was still angry about the money being lost.  Mathies stripped JV-1 down to check for the missing money, because Mathies thought she had hidden it on her person.  While he did this, he pulled her hair.  Mathies did not locate any money.  JV-1 stated that after Mathies searched her for the money, they had "make-up sex."

24.     JV-1 was unsure how many days had gone by between the first time Mathies and Foster took her out to walk the street to perform car dates and the second occurrence. JV-1 stated that Foster drove again, and Mathies was in the front seat. Mathies and Foster were looking for Mia so that she could walk with JV-1 to conduct dates, but they could not find her. JV-1 stated that Mia could "come and go" from Foster's house, but JV-1 was not allowed to leave.

25.     That night, JV-1 walked the street by herself while Foster and Mathies waited in the car in at McDonald's parking lot. JV-1 walked out of Mathies' sight and conducted a car date, which consisted of penis to vagina sex with a male who did not wear a condom. The date gave her $150, which she hid in her bra. After completing that date, JV-1 returned to the car where Mathies and Foster were waiting. She stated they did not know she had completed a date, so she was able to keep the money. They then returned to Foster's house.

26.     Once at Foster's residence, JV-1 and Mathies got into an argument, and JV-1 got her belongings and attempted to leave. During this argument, Mathies took JV-1's phone. Mathies wanted to JV-1 to unlock her phone so he could look at it. JV-1 refused to unlock it. JV-1 stated that Mathies was following her and yelling at her as she walked down the street. JV-1 refused to unlock her phone, so Mathies threw JV-1's phone into the river and left.

27.     JV-1 continued to walk around and briefly fell asleep near a YMCA. She stated she woke up sometime later because she was cold and returned to Foster's residence. She believed it to be after midnight or in the early hours of the morning when she woke up.

28.     JV-1 was "banging" on the back door of Foster's residence, and Mathies answered the door and told her to leave. JV-1 stated she pushed into the residence and got into a physical altercation with Mathies. Mathies grabbed her and tried to shove her outside, so JV-1 grabbed a knife off the kitchen counter and stabbed Mathies in the arm with it. Foster and Cynthia heard all

the noise and came downstairs to break up the fight. JV-1 stated that she slept on the couch at Foster's residence after Foster and Cynthia broke up the fight.

29.    When JV-1 woke up, Mia was at the residence. Mia left at some point during the day, and Mathies and JV-1 "went back to normal."

30.    On June 15, 2017, Mathies and Foster took JV-1 out for a third time to walk the street to engage in sex acts for money. JV-1 stated a car with dark tinted windows pulled up, and she got into the vehicle with two black males. However, before she could complete the date, the vehicle got pulled over by the Milwaukee Police Department (MPD). JV-1 was taken into custody because of the missing juvenile report that had been filed. At that time, JV-1 did not disclose anything to MPD about Mathies or Foster or doing car dates. JV-1 was turned over to her aunt and later taken home to Menasha.

31.    JV-1 stated she did remain in communication with Foster and Cynthia once returned home to Menasha. In July 2017, JV-1 got into a fight with her mother and contact Foster via Facebook and requested Foster pick her up. JV-1 stated Foster did come to her residence, but police were called when she attempted to leave with Foster. JV-1 stated Foster left the area when JV-1's father stated he was calling the police.

32.    JV-1 stated she never provided any of the money from the dates to Foster; however, Foster knew about Mathies' business of having girls conduct sex acts for money. JV-1 stated she did have sex with Foster one time at Foster's residence. JV-1 stated she did not see Mia provide any money to Foster either but knows that Foster also had sex with Mia.

33.    On April 27, 2021, JV-1 stated Foster attempted to reached out to her on Facebook messenger a couple of months prior; however, her significant other intervened and told Foster to leave JV-1 alone.

**B. Facebook records of Cintaurean Mathies between November 2016 – September 2017**

34.     On September 22, 2017, SA Roffers applied for a State search warrant in Outagamie County for records related to multiple Facebook accounts for Cintaurean Mathies including the following associated account URLs:

   **a.** https://www.facebook.com/cintaurean.mathies.35

   **b.** https://www.facebook.com/cintaurean.mathies.39

   **c.** https://www.facebook.com/profile.php?id=100009468700293

35.     SA Conrad reviewed the records that SA Roffers received from Facebook in response to the warrant and located numerous conversations related to JV-1, as well as other conversations where Mathies appeared to be grooming other women and girls to engage in commercial sex dates.  In these conversations, Mathies discussed specifics about dancing/stripping and engaging in prostitution dates. He talked to females about making money "together" by having them conduct dates.  He would also talk to them about teaching them to pole dance so they could "join his team" to make money if they did not want to conduct dates.  On multiple occasions Mathies stated he wanted to "cuff" certain females or make them his "bottom," again so they could make money.   Mathies also engaged in conversation with Trehvis Foster regarding women and girls engaging in commercial sex dates.  Mathies discussed JV-1 with Trehvis Foster also.  The following examples were all located in the Facebook return from account URL https://www.facebook.com/profile.php?id=100009468700293.

**a.  Communications with Trehvis Foster Facebook user ID 1682984231**

36.     Numerous conversations between Trehvis Foster and Mathies discussed activities related to sex trafficking.  On April 15, 2017 Mathies told Foster, "[M]y bitch hitting the blade tonight we getting on some money."  Foster responded and asked, "[W]hat's the blade?" Mathies

stated, "[T]he hoe strip." The conversation continued, and Mathies asked Foster to come along at 10 p.m. to the south side of Milwaukee. Foster responded "ok…ok".

37. On May 4, 2017 Foster asked Mathies, "[W]here yo employees at?? Lol." Mathies responded, "[L]ol one run off ND the other at work ND I'm laying down with my bitch." Foster asked, "[W]ho ran off? Who at work?" Mathies replied, "[M]y young bitch Nd Passion at work."

38. On June 4, 2017, while JV-1 was staying with Mathies, Mathies asked Foster to take him to pick up a "lil bitch." Mathies then sent Foster a photo of JV-1 with the message, "Bitch mad cause it's hit ND she feel uncomfortable… I told the bitch you bout to rush me for shit."

39. On June 15, 2017, the date when MPD recovered JV-1, Foster messaged Mathies saying, "If she got popped… get the phone… anything??" Mathies did not respond to Foster's messages right away. A few hours later, he answered, "I'm don with both these hoes… cause the bitch working with another mf she gotta go too no lie… the bitch talkn bout she got robbed again… ND she ain't got no money… and acting like she pissed frfr… I'm good on her… Nd the bitch ain't got shit ND sneaking on the phone with the nigga."

**b. Communications with JV-1**

40. Among the conversation strings of note was a Facebook Messenger chat between Mathies and JV-1 that began on December 11, 2016 and continued intermittently through May 4, 2017.

41. In January 2017, JV-1 told Mathies that she was 16 years old and she lived with her parents in Menasha, Wisconsin. During parts of the conversation Mathies talked about how JV-1 would be working for him and asked if she knew how to dance. JV-1 one sent Mathies her parents' address for him to pick her up.

### c. Communications with "Miahh the Goddess"

42.     There were also numerous conversations of interest between Mathies and Facebook user "Miahh the Goddess" ["Miahh"].  The conversations occurred during the period when JV-1 stated she was staying with Mathies in Milwaukee along with the girl she knew as Mia.

43.     On June 9, 2017, Miahh was upset about another female staying at the house with them.  On June 10, 2017, Miahh sent a message to Mathies that read, "[S]o wtf is about to happen? Is this bitch staying here or what?"  Mathies did not respond to that message.  Miahh continued, stating, "So u telling this girl that u love her… You're gonna put a ring on finger and that I'm not your concern, but she is?"  Mathies responded, "[H]ell nah."

### d. Communications with Cynthia Foster

44.     SA Conrad also noted a conversation between Mathies and a Facebook account with the username "Kason Kaylyn Kayden Foster."  This account has been identified as belonging to Cynthia Foster.  The conversation took place on June 9, 2017, during which time JV-1 was staying with Mathies.  In this conversation, Mathies and Cynthia discussed a female coming to the house and getting into an argument with Mathies.  Cynthia told Mathies she thought both females staying at the residences were named "Mya."  Mathies cleared this up by telling Cynthia JV-1's real first name.

45.     Cynthia told Mathies she thought Mya was lying about being 18 years old.  Mathies said Mya was 18 years old, but he felt both girls were "sneaky" and that he could not trust them. By the end of the conversation, Mathies stated that he was going to ask Mya to leave.

### e. Other Communications with Women and Girls

46.     Between November 2016 and September 2017, Mathies had Facebook conversations with a few hundred different female Facebook users.  In approximately 100 of those

conversations, Mathies sent and received sexually explicit photos exchanged with those users. Approximately twelve of the users who sent nude images of themselves told Mathies that they were under the age of 18. At least five of these girls have been identified, and law enforcement has confirmed that they were, in fact, minors at the time the images were sent. Many of these images were sent to Mathies during the course of Facebook audio conversations.

### C. Foster's Facebook Account Information

47.     SA Conrad reviewed Mathies' Facebook Accounts and only observed Trehvis Foster communicating with Mathies utilizing one account, with Facebook user ID 1682984231. Further, a photo from Foster's Facebook account with user ID 1682984231 was provided to JV-1 on March 3, 2020 and JV-1 indicated this was Trehvis Foster who provided the transportation during her commercial sex acts.

### D. Facebook records of Trehvis Foster between November 2017 – May 2021

48.     On May 21, 2021 Honorable Stephen C. Dries authorized a search warrant for Trevhis Foster's Facebook account, Facebook user ID 1682984231, for the time period of November 2017 to May 2021. This warrant was served on Facebook May 21, 2021 and returned to SA Conrad on June 7, 2021.

49.     SA Conrad reviewed the records provided by Facebook for Trehvis Foster's account user ID: 1682984231. Conversations were located between Foster and another Facebook user discussing prostitution related activities. The other Facebook user was Tony Taylor, user id: 100013515069108 who was a known associate of Cintaurean Mathies. The conversations took place in November 2017 and December of 2017. During the conversations Foster talked about "flipping" females and about an unknown female being "his money maker" and calling him "daddy." During one conversation Taylor asked Foster about an unspecified female being an "ex"

of Mathies. Foster responded to Taylor by saying "she chose up", which is a common term used by traffickers indicating their victim(s) went to a different trafficker.

50. SA Conrad further noticed Foster's Facebook messages appeared to subside in 2018 and Foster's Facebook activity on the account was minimal during 2019 and 2020. Based on SA Conrad's training and experience, she believes that Foster's account was deactivated and reactivated numerous times during 2019 and 2020.

51. SA Conrad did not locate any conversations between JV-1 and Foster during the time period of November 2017 to May 2021; however, JV-1 did comment on Foster's status updates in 2018 and wished Foster a happy birthday.

## IV. GENERAL KNOWLEDGE CONCERNING FACEBOOK

52. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

53. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

54. A Facebook user can connect directly with other individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a

list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

55.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

56.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

57.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the

photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

58.     Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

59.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites.

60.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

61.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

62.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

63.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

64.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

65.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

66.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a

Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

67. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning

subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

68.     I know based on my training and experience that traffickers commonly use Facebook to advertise their status as a pimp, such as by displaying cash, vehicles, clothing, and other material goods they have obtained as a result of the lifestyle, or posting quotes, memes, or other material about pimping.  They also use Facebook to communicate with existing victims, and groom and recruit new victims.  I have noted these generalities to be true in this case, based on the records already received from Facebook pertaining to Cintaurean Mathies.

## V.     INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

69.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

70.     This application seeks a warrant to search all responsive records and information under the control of Facebook, Inc., a provider subject to the jurisdiction of this Court, regardless of where Facebook, Inc. has chosen to store such information.  The government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within Facebook, Inc.'s possession,

custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States.[1]

## VI.    CONCLUSION

71.    Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Facebook, Inc., who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

72.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

---

[1] In *Microsoft Corp. v. United States*, 829 F.3d 197 (2nd Cir. 2016), the Second Circuit held that the government cannot enforce a warrant under the Stored Communications Act to require a provider to disclose records in its custody and control that are stored outside the United States.  In the Eastern District of Wisconsin, however, in cases 17-MJ-1234 and 17-MJ-1235, 2017 U.D. Dist. LEXIS 24591 (Feb. 21, 2017), U.S. Magistrate Judge William E. Duffin rejected the Second Circuit's decision in *Microsoft* and issued warrants that required Google and Yahoo! to disclose "all data responsive to the warrant regardless of whether that data may be stored on servers in or outside the United States."  I therefore respectfully request that this warrant apply to all responsive information— including data stored outside the United States—pertaining to the identified account that is in the possession, custody, or control of Facebook, Inc. The government also seeks the disclosure of the physical location or locations where the information is stored.

**ATTACHMENT A**
**Premises to be Searched**

This warrant to applies to information associated the Facebook user ID 1682984231 that

is stored at premises owned, maintained, controlled, or operated by Facebook, a company

headquartered in Menlo Park, California:

**ATTACHMENT B**
**Items to be Seized**

## I.      Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A for the period of November 1, 2016 to November 1, 2017:

1. All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

2. All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

3. All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

4. All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

5. All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

6. All other records and contents of communications and messages made or received by the user, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

7. All "check ins" and other location information;

8. All IP logs, including all records of the IP addresses that logged into the account;

9.      All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked;"

10.     All information about the Facebook pages that the account is or was a "fan" of;

11.     All past and present lists of friends created by the account;

12.     All records of Facebook searches performed by the account;

13.     All information about the user's access and use of Facebook Marketplace;

14.     The types of service utilized by the user;

15.     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

16.     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

17.     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within 14 DAYS of service of this warrant.

## B.      Information to be seized by the government

All information described above in Section A that constitutes fruits, evidence, and instrumentalities of violations of Title 18, United States Code, Sections 1591(a)(1) involving Trehvis Foster, including, for the account identifiers listed on Attachment A, information pertaining to the following matters:

1.      Messages, photographs, videos, memes, status updates, comments, or other postings or communications;

2.      Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

3.      Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

4.      The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).